# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. ASHU GARG, ) | |
|         Plaintiff ) | |
| ) | |
|        v. ) | Civil Action No. |
| ) | |
| VHS ACQUISITION SUBSIDIARY, NO. 7 ) | |
| d/b/a SAINT VINCENT HOSPITAL, ) | |
| DAVID BADER, JOHN MUKAI, and, ) | |
| DOUGLAS BURD ) | |
|        Defendants. ) | |

## VERIFIED COMPLAINT

This is a complaint brought by a hardworking and dedicated physician who was denied an equal opportunity to complete his radiology residency because of his age. Defendants then terminated his employment after he complained of the disparate treatment. Defendants' actions are in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA") and Chapter 151B. Defendants also breached their written employment agreement with plaintiff, the implied covenant of good faith and fair dealing, and tortuously interfered with plaintiff's contractual relations.

### Parties

1. Plaintiff, Dr. Ashu Garg ("Dr. Garg"), is an individual residing at 159 Macadamia Lane, Simi Valley, Ventura County, California 93065.

2. Defendant, VHS Acquisition Subsidiary No.7, doing business as Saint Vincent Hospital ("SVH"), is a community hospital in Worcester founded by the Sisters of Providence in 1893, with a principal place of business at 123 Summer Street, Worcester, Worcester County, MA 01608.

3. Defendant, Dr. David Bader is the Director of SVH's Radiology Residency Program and has a usual place of business at 123 Summer Street, Worcester, MA 01608.

4. Defendant, Dr. John Mukai, is a faculty member of SVH's Radiology Residency Program and has a usual place of business at 123 Summer Street, Worcester, MA 01608.

5. Defendant, Dr. Douglas Burd, is a faculty member of SVH's Radiology Residency Program and has a usual place of business at 123 Summer Street, Worcester, MA 01608.

<u>Background</u>

6. In 1998, Dr. Garg graduated with a medical degree from Sarojini Naida Medical College, Agra, India, where he successfully completed a formal radiology training rotation.

7. For eight years, Dr. Garg performed many surgeries including cancer surgeries, where he determined the pre-operative plan based on the radiology imaging studies, both routinely and on an emergency basis. In surgical oncology, he regularly evaluated USG, CT/ MRI and PET CT scans to make life saving surgical decisions.

8. In or around October 2008, Dr. Garg moved to the United States. During the process of applying for ECFMG, he received 90% and 97% scores in USMLE Step 1 and Step 2 CK respectively.

9. Subsequently, he applied for a residency with the expectation that he would become a radiologist and interventional radiologist.

10. Dr. Garg completed his first post-graduate year ("PGY") training at UIC/ Metropolitan Group of Hospitals in Chicago which required only one-year training (temporary) license.

11. Following his PGY1, Dr. Garg completed his PGY2 and PGY3 at the University of Oklahoma ("OUHSC").

12. Dr. Garg was awarded full unrestricted state medical licenses in the state of Oklahoma and California, based on his credentials and following successful fulfillment of other essential licensing requirements, in year 2014 and 2016 respectively.

<u>SVH Residency</u>

13. In June of 2016, Dr. Garg applied to an open PGY4 residency position with SVH. He interviewed twice with Program Director, Dr. David Bader.

14. Despite a Confidentiality Agreement, upon information and belief, Dr. Bader learned additional information about Dr. Garg from OUHSC, evident from comments made by SVH later on, that demonstrated an undue bias toward the evaluation of Dr. Garg's performance.

15. SVH offered him the PGY4 position in August, which Dr. Garg accepted.  *See* August 2, 2016 Offer Letter, attached as <u>Exhibit A</u>.

16. Per Accreditation Council for Graduate Medical Education ("ACGME") requirements, each residency program is required to provide all incoming residents with written expectations of the program.

17. The parties signed a Resident Agreement on or about September 12, 2016 ("Resident Agreement"), which stated that SVH would provide a Graduate Medical Education ("GME") Policy Manual to Dr. Garg.  The program also is required to provide a Radiology Residency Manual to Dr. Garg.  *See* Resident Agreement, attached as <u>Exhibit B</u>.

18. However, Dr. Garg did not receive a GME Policy Manual nor any written (or electronic form) expectations of the radiology residency program until he requested it in July of 2017 – after SVH terminated his employment.

19. Paragraph 3(b) of the Resident Agreement reads as follows:

b) RENEWAL TERM. (i) Notice of Renewal/Non-Renewal. If Hospital, in its sole discretion, offers the Resident Physician the opportunity to renew this Agreement for an additional term of twelve (12) months, Hospital will provide Resident Physician with notice of not less than four (4) months prior to the expiration of the Initial Term, unless the primary reason(s) for the non-renewal occurs within the four months prior to the end of this Agreement. In that event, Hospital shall provide Resident Physician with at least five (5) days' notice of the nonrenewal before the end of the Initial Term or applicable renewal term.

20. After completing credentialing and licensing requirement for the Massachusetts Board of Registration in Medicine, Dr. Garg began the PGY4 on September 12, 2016. He was expected to complete his residency in radiology at SVH in two years by September 2018.

21. Dr. Garg was 46 years old when he began the program.

22. Upon information and belief, he was the oldest resident in the program, as the age range for the other residents was 26 to 36 years old.

<u>Night Float Coverage</u>

23. SVH determined Dr. Garg was competent and prepared to take night float in October 2016, one month into his residency at SVH, even though SVH knew that he had not taken night float in his previous residency.

24. In this role, Dr. Garg served as a senior radiologist at SVH at night covering the entire service with indirect supervision and support. Per SVH, Dr. Garg had to be a fully formed, fully functional radiologist performing life-saving critical diagnostic interpretations in real time in this role.

25. In or around November 2016, Dr. Bader met with Dr. Garg to discuss Dr. Garg's performance and concerns around the night float coverage.

26. On or about December 21, 2016, Dr. Bader met with Dr. Garg again and reported that Dr. Garg made "significant improvements over the past month". *See* ER Rotation Evaluation, attached as Exhibit C.

<u>SVH writes letters of recommendation for Dr. Garg</u>

27. On January 20, 2017, Dr. Bader wrote a letter of recommendation in support of Dr. Garg's application for a fellowship with vascular interventional radiology fellowship. *See* January 20, 2017 Letter from Dr. Bader, attached as Exhibit D.

28. Associate Chief of Radiology, Dr. Brian Midkiff and Acting Director, Vascular and interventional Radiology, Dr. Gregory Berberian, also wrote letters of recommendation for Dr. Garg for the fellowship. *See* Recommendation Letters, attached as Exhibit E.

29. On February 14, 2017, Dr. Bader wrote a letter to the American Board of Radiology that he expected Dr. Garg to complete his residency by June of 2018 – less than the required typical two years. *See* February 14, 2017 Letter from Dr. Bader, attached as Exhibit F. Dr. Garg made this request to Dr. Bader, who stated that he would only agree after he considered Dr. Garg's performance and spoke with other staff at the residency.

30. On February 22, 2017, Dr. Bader wrote a second letter to the American Board of Radiology, which confirmed Dr. Garg's understanding that he was performing well. *See* February 22, 2017 Letter from Dr. Bader, attached as Exhibit G.

<u>Dr. Garg needs improvement in patient care and medical knowledge</u>

31. The next day, Dr. Garg received a written warning that stated he did not meet performance expectations in the core competencies of patient care and medical knowledge. Though Dr.

5

Garg disagreed, he acknowledged that SVH believed that there were two practice areas upon which he could improve.  In all other core competencies, Dr. Garg met expectations.

32. He responded to the written warning by email on March 2, 2017, in which he explained that Dr. Burd's evaluation of Dr. Garg's readings was not accurate, as Dr. Garg spoke to others who confirmed that Dr. Garg's readings were correct.  In response, Dr. Bader told Dr. Garg that this was not related to Dr. Burd and reiterated SVH's concerns about patient care and medical knowledge.

33. This is around the time that Dr. Garg noticed that he was treated less favorably than the younger residents.  Dr. Burd's unreasonable criticism of Dr. Garg's radiology readings, while being lax with the younger residents, was evidence of this.

34. Nonetheless, Dr. Bader agreed to recommend that Dr. Garg can complete the program in less than two years.  Dr. Bader and others also wrote letters of recommendation for the fellowship – to which he was subsequently matched.

35. In fact, between March and June of 2017, Associate Program Director, Dr. Kanzaria, instructed and assigned Dr. Garg to actively participate in the department's American Board of Radiology Core examination preparation sessions, which was typically reserved for PGY4 and sometimes, for repeat/ failed PGY5 residents.

36. Based on the above, Dr. Garg reasonably believed that his overall performance was satisfactory and convinced himself that SVH staff was not inappropriately considering his age in their evaluation of his performance.

<u>The disparate treatment continues</u>

37. However, soon thereafter, Dr. Bader and Dr. Kanzaria also singled Dr. Garg out without reason.

38. Specifically, on or about April 18, 2017, both Dr. Bader and Dr, Kanzaria unreasonably criticized Dr. Garg for inadvertently failing to sign one "sign out form".  *See* April 18, 2017 Email from Drs. Bader and Kanzaria, attached as <u>Exhibit H</u>.

39. In contrast, Dr. Garg is aware of at least one resident significantly younger than Dr. Garg, who failed to do so for five consecutive days, without criticism.

40. Not only had Drs. Bader and Kanzaria treated him less favorably than the younger residents, but also Dr. Mukai made an age-related comment toward Dr. Garg.

41. Around that same time, during a conversation about images, Dr. Mukai repeatedly asked Dr. Garg's age.  When Dr. Garg responded that he was over 40, Dr. Mukai rudely said, "You are fucking forty years old and trying to learn radiology now?".  Later SVH admitted that Dr. Mukai made this statement, however, tried to dilute its harshness by stating that Dr. Mukai referenced this to Dr. Garg's "wisdom" and "experience".

42. Dr. Garg hesitated to raise these concerns as he did not want to take any action that could jeopardize his residency.

<u>SVH offers Dr. Garg a position for his final year of residency</u>

43. Per the Resident Agreement, SVH was supposed to provide notice of renewal at least four months in advance of the expiration of the initial term (June 30, 2017).

44. However, on April 26, 2017, Dr. Bader signed an offer letter for Dr. Garg to complete his final year of residency through June 2018 ("Renewal"), which confirmed that Dr. Garg's overall performance was satisfactory. The Renewal did not reference any concerns about Dr. Garg's performance or that the offer may be revoked if he does not perform satisfactorily. *See* April 26, 2017 Renewal, attached as <u>Exhibit I</u>.

45. After Dr. Bader signed the Renewal, he issued Dr. Garg a written warning on May 3, 2017 for his alleged unsatisfactory performance in March and April.  *See* May 3, 2017 Written Warning, attached as <u>Exhibit J</u>.

46. At this stage, Dr. Garg was confused by SVH's evaluation of his performance, as the second written warning referenced details that were false.

47. Specifically, it referenced that SVH reviewed expectations with Dr. Garg, that his readings had to be re-read and the timeliness of his reporting, none of which were true.

48. Dr. Garg was suspect of the SVH and the decision makers' true motives and now, he felt compelled to report the disparate treatment he was experiencing.

<u>Dr. Garg's complaint</u>

49. On May 12, 2017, Dr. Garg complained to Dr. Bader about Dr. Burd's disparate treatment. Dr. Garg offered to meet with Dr. Bader to review the readings to see Dr. Burd's unreasonable criticism, and because there were discrepancies by the attendings. *See* May 12, 2017 Email from Dr. Garg, attached as <u>Exhibit J</u>.

50. In response, Dr. Bader said that the two of them would have to meet with Human Resources as a result of Dr. Garg's "accusation of discrimination."  *See* May 12, 2017 Email from Dr. Bader, attached as <u>Exhibit K</u>.

51. Concerned that doing so could jeopardize his final year of residency, Dr. Garg said there was no need to meet with Human Resources.

52. Neither Dr. Bader nor Human Resources followed up with Dr. Garg on his complaint.

53. Dr. Garg pointed out to Dr. Bader that he was singled out for not completing one sign out sheet, while another younger resident failed to complete six.

54. In mid-May, Dr. Garg started his fluoroscopy rotation. During this time, Dr. Garg had to work with broken fluoroscopy machines and when he complained about this to Dr. Mukai, Dr. Mukai suggested that working on broken machines better prepared the residents.

55. Dr. Garg signed the Renewal on May 15, 2017, which bound both parties to Dr. Garg completing his PGY-5 at SVH from July 1, 2017 to June 30, 2018.

56. Around that same time, Dr. Garg also agreed to make up some days in November 2017, confirming that he would complete his final year of residency at SVH. *See* Absence Make-Up Time Form, attached as Exhibit L.

### SVH continues to assign Dr. Garg significant responsibilities

57. SVH assigned Dr. Garg to take his third night float from June 10-15, fully trusting him to read and review images effectively and independently. Dr. Garg served as a senior radiologist at SVH at night covering the entire service with indirect supervision and support. Per SVH, Dr. Garg had to be a fully formed, fully functional radiologist performing life-saving critical diagnostic interpretations in real time in this role.

58. Upon completing the night float, Dr. Garg did not receive any negative feedback from SVH staff.

59. On June 14, 2017, Dr. Garg was matched for his Interventional Radiology fellowship at NYU Medical Center, through the National Resident Matching Program. *See* Print out of Match Results, attached as Exhibit M.

### SVH abruptly terminates Dr. Garg's residency, despite improvements

60. On June 21, 2017, Dr. Bader and Dr. Kanzaria met with Dr. Garg and presented him a termination letter that stated Dr. Garg failed to meet performance expectations of a PGY4

level during assessment for academic year 2016-2017.  *See* June 21, 2017 Termination Letter, attached as <u>Exhibit N</u>.  Dr. Garg was shocked.

61. During this same meeting, they also provided Dr. Garg with his Year End Milestone Evaluation, which stated that Dr. Garg improved in the two core competencies in which he was previously criticized - patient care and medical knowledge.  It was clearly evident that he did better in these two core competencies, and still performed satisfactorily in the remaining core competencies. *See* Year End Milestone Evaluation, attached as <u>Exhibit O</u>.

62. He had not made any material mistakes between the time he signed SVH's Renewal and the termination letter.  Moreover, he improved in the two areas that SVH expressed concerns in the past.

63. Dr. Garg was gravely concerned that SVH not only discriminated against him because of his age, but also penalized him for his complaint of discrimination.

64. Shortly thereafter, Dr. Garg met with Dr. Midkiff, who did not believe that SVH would overturn the termination or allow Dr. Garg an opportunity to resign.

65. In late July 2017, Dr. Mukai provided an overall general evaluation of Dr. Garg's performance in which he mostly received rankings of "Very Good".  *See* Overall General Evaluation, attached as <u>Exhibit P</u>.

66. Dr. Garg also was confident that his 360 evaluations by other radiology residents were more than satisfactory.

67. Dr. Bader's inconsistent evaluation of Dr. Garg's performance suggested that he harbored retaliatory animus toward Dr. Garg after he complained about discrimination.

<u>Dr. Garg's appeal efforts</u>

68. Dr. Garg requested that he be allowed to complete the ARIP course already scheduled/enrolled for the month of August, so that he could be eligible for the core Board exams, but SVH denied his request.

69. Dr. Garg appealed the termination decision, in which he also made a formal complaint through counsel regarding the discrimination on or about July 12, 2017.

70. On or about July 19, 2017, Director of Medical Education, Dr. Yuka-Marie Vinagre, determined that in lieu of termination, SVH could offer Dr. Garg the opportunity to repeat his PGY4 with zero credits for the past ten months. SVH also asked Dr. Garg to rescind his acceptance of the current PGY-5 position. However, SVH also told Dr. Garg that even if he successfully completed his repeated PGY4, he could not finish his residency at SVH. Instead he had to find a new program to complete his final PGY5 year of residency.

71. Dr. Garg knew that this was not a fair resolution given that it would be impossible for him to find a program that will accept him as a PGY5 resident. SVH is well aware of the rarity of an open PGY-5 position.

72. Dr. Vinagre's decision was also inconsistent with SVH's announcement that Dr. Garg was listed as a member of its House Staff for 2017-2018 year as a PGY5 resident. *See* Printout from Hospital dated July 22, 2017, attached as Exhibit Q.

73. Thus, Dr. Garg appealed Dr. Vinagre's decision.

74. SVH's Chief Executive Officer, Jeffrey M. Welsh, and Dr. Bader held a meeting with Dr. Garg on August 7, 2017.

75. At the meeting, SVH had its outside counsel in attendance, Attorney Barbara Hayes Buell. Despite his request, Dr. Garg was denied an opportunity to have his counsel attend. *See* August 1, 2017 Email from Attorney Buell, attached as Exhibit R.

76. The next day, Welsh reaffirmed the decision to terminate Dr. Garg's residency, without any opportunity for Dr. Garg to repeat his PGY4 or provide any credits for the eleven months he worked at SVH.

77. Dr. Garg tried applying to programs in other states. However, because his termination was finalized in August 2017, it was already too late to apply.

78. In October 2017, for purpose of residency transfer and also for ABR academic credits, Dr. Garg requested Dr. Bader to provide a summary evaluation, per the required standards set forth by the ACGME.

79. Dr. Bader misrepresented in the Summative Evaluation that Dr. Garg had not met performance expectations in core competencies of Patient Care and Medical Knowledge, despite his year-end review where Dr. Garg was told he did.

80. Because of this misrepresentation, Dr. Garg has been unable to secure a residency in any other program.

81. In October 2017, SVH notified ABR that Dr. Garg is no longer working in its residency program. See October 11, 2017 Letter from ABR to Dr. Garg, attached as Exhibit S. This demonstrates the program's interference with Dr. Garg's ability to complete the ABR Core exam (Part 1 of American Board of Radiology examination).

82. Through counsel, Dr. Garg repeatedly requested copies of all documents from his residency folder during the appeal process and after his termination was finalized in August 2017.

83. However, SVH did not provide many of the documents until June 2018.

84. This delay caused further harm to Dr. Garg because without a complete copy of his documents as a PGY4 resident, it hindered his ability to fully enforce his rights.

85. Dr. Garg satisfied the administrative filing requirement under M.G.L. c. 151B, §9 by filing a complaint against defendants with the Massachusetts Commission Against Discrimination, subsequently withdrawn on or about August 8, 2019.

<u>COUNT I</u>

<u>The Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.</u>

86. Dr. Garg alleges and incorporates by reference all of the above allegations.

87. Dr. Garg was entitled to an equal opportunity to complete his residency. He also was entitled to full credit for his PGY4 residency at SVH.

88. In accordance with the ADEA, Dr. Garg also had the right to complain to be free from disparate treatment.

89. Defendants interfered with and denied Dr. Garg's rights under the ADEA when it treated him differently than younger residents, in violation of 29 U.S.C. § 623(a).

90. Defendants interfered with and denied Dr. Garg's rights under the ADEA when it terminated his employment, in violation of 29 U.S.C. § 623(a).

91. Defendants retaliated against Dr. Garg for having exercised his right under the ADEA to continue working at SVH, despite his complaint of discrimination, in violation of 29 U.S.C. 623(d).

92. As a result of the above actions, Defendants violated the ADEA.

93. Defendants' unlawful mistreatment of Dr. Garg has caused him to suffer financial losses in excess of $75,000.00, including lost wages, and to endure significant emotional distress.

<u>COUNT II</u>

<u>Massachusetts General Laws, Chapter 151B</u>

94. Dr. Garg alleges and incorporates by reference all of the above allegations.

13

95. Dr. Garg was entitled to an equal opportunity to complete his residency. He also was entitled to full credit for his PGY4 residency at SVH.

96. In accordance with Chapter 151B, Dr. Garg also had the right to complain to be free from disparate treatment.

97. Defendants interfered with and denied Dr. Garg's rights under Chapter 151B when it treated him differently than younger residents.

98. Defendants interfered with and denied Dr. Garg's rights under Chapter 151B when it terminated his employment.

99. Defendants retaliated against Dr. Garg for having exercised his right under Chapter 151B to continue working at SVH, despite his complaint of discrimination.

100. As a result of the above actions, Defendants violated Chapter 151B.

101. Defendants' unlawful mistreatment of Dr. Garg has caused him to suffer financial losses in excess of $75,000.00, including lost wages, and to endure significant emotional distress.

<u>COUNT III</u>

<u>Breach of Contract</u>

102. Dr. Garg hereby restates and realleges all above paragraphs.

103. Dr. Garg and SVH had a valid Resident Agreement, which was renewed on or about May 15, 2017, for a renewal term from July 1, 2017 to June 30, 2018.

104. SVH breached the Resident Agreement when it terminated Dr. Garg's employment without a reason that occurred between May 15, 2017 and June 21, 2017.

105. SVH also breached the Agreement when it failed to give him full credit for his PGY4 residency at SVH and did not allow him to complete his residency at SVH.

106. SVH's breach caused and continues to cause Dr. Garg to suffer damages in excess of $75,000.00.

## COUNT IV

### Breach of the Implied Covenant of Good Faith and Fair Dealing

107. Dr. Garg hereby restates and realleges all above paragraphs.

108. Dr. Garg and SVH had a valid Resident Agreement, which was renewed on or about May 15, 2017, for a renewal term from July 1, 2017 to June 30, 2018.

109. SVH breached the implied covenant of good faith and fair dealing when it when it terminated Dr. Garg's employment without any good faith reason that occurred between May 15, 2017 and June 21, 2017.

110. SVH also breached the implied covenant of good faith and fair dealing when it failed to give him full credit for his PGY4 residency at SVH and did not allow him to complete his residency at SVH.

111. SVH's breach caused and continues to cause Dr. Garg to suffer damages in excess of $75,000.00.

## COUNT V

### Tortious interference with Dr. Garg's contractual relations with the ABR

112. Dr. Garg hereby restates and realleges all above paragraphs.

113. Dr. Garg had a contract with the ABR to take the Core exam (Part 1 of the ABR exam).

114. Dr. Garg also had a contract with NYU Medical Center for the Interventional Radiology fellowship.

115.  Defendants knowingly interfered with Dr. Garg's contract with the ABR by wrongfully terminating his residency, which then caused the ABR to terminate Dr. Garg' eligibility to take the exam.

116.  Defendants interference with the contract was improper because the termination was based on discrimination and retaliation.

117.  Dr. Garg was unable to take the ABR exam, which then prohibited him from completing his PGY5 and become a radiologist.

118.  Defendants' improper interference caused Dr. Garg to suffer harm in the form of future lost wages, distress, and he incurred attorney's fees.


<u>COUNT VI</u>

<u>Tortious interference with Dr. Garg's contractual relations with NYU Medical Center</u>

119.  Dr. Garg hereby restates and realleges all above paragraphs.

120. Dr. Garg had a binding NRMP contract with NYU Langone Medical Center, Manhattan for the Interventional Radiology fellowship starting July 2018.

121. Defendants knowingly interfered with Dr. Garg's contract with NYU Langone Medical Center, Manhattan by wrongfully terminating his residency, which then ultimately resulted in a rescission of the fellowship offer.

122. Defendants interference with the contract was improper because the termination was based on discrimination and retaliation.

123. Dr. Garg was unable to participate in the fellowship, which prevented him from future career opportunities to become an interventional radiologist and ultimately prohibited him from becoming a practicing Vascular and Interventional radiologist.

124. Defendants' improper interference caused Dr. Garg to suffer harm in the form of future lost wages, distress, and he incurred attorney's fees.

<div align="center">REQUESTS FOR RELIEF</div>

WHEREFORE, Dr. Garg respectfully requests that this Court grant the following relief:

1. Reinstate Dr. Garg to complete his PGY5 and issue him full one-year credit for his PGY4 at SVH.

2. Lost wages, punitive damages and emotional distress damages due under both state and federal claims, as well as the breach of contract and breach of the implied covenant of good faith and fair dealing.

3. Lost wages, including interest and liquidated damages, under the ADEA and Chapter 151B.

4. Reasonable attorneys' fees as well as the costs of this action; and

5. Such other and further relief as a court may deem necessary and proper.

<div align="center">JURY DEMAND</div>

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
DR. ASHU GARG
By his attorneys,


/s/ Kavita M. Goyal
Kavita M. Goyal (BBO # 654013)
Matthew Perry (BBO # 703809)
Rosen & Goyal, P.C.
204 Andover Street, Ste. 402
Andover, MA 01810
(978)474-0100
kgoyal@rosenlawoffice.com
mperry@rosenlawoffice.com

Date: May 28, 2020

2. Lost wages, punitive damages and emotional distress damages due under both state and federal claims, as well as the breach of contract and breach of the implied covenant of good faith and fair dealing.

3. Lost wages, including interest and liquidated damages, under the ADEA and Chapter 151B.

4. Reasonable attorneys' fees as well as the costs of this action; and

5. Such other and further relief as a court may deem necessary and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
DR. ASHU GARG
By his attorneys,

_____
Kavita M. Goyal (BBO # 654013)
Matthew Perry (BBO # 703809)
Rosen & Goyal, P.C.
204 Andover Street, Ste. 402
Andover, MA 01810
(978) 474-0100
kgoyal@rosenlawoffice.com
mperry@rosenlawoffice.com

Date: May ___, 2020

## VERIFICATION

I, Dr. Ashu Garg, on oath, state that I have read the above Complaint, including its corresponding exhibits, and that the facts averred therein are true and, as to statements made upon on information and belief, I believe those to be true.

May 26 2020

_____
Dr. Ashu Garg

17

# EXHIBIT A



August 2, 2016

Dr. Ashu Garg
2313 NW 156th St.
Edmond, OK 73013

Dear Dr. Garg,

Saint Vincent Hospital is very pleased to offer you the opportunity to become a PGY-4 (R3) in the Radiology Residency Program beginning on and no later than September 12, 2016 subject to the terms of this letter. You will receive a compensation of $60,609. 00 subject to the terms of the contract for your PGY-4 year.

You will be provided a health plan as a hospital employee. Plan details, including costs, will be provided separately. Your benefits will be effective your first day of employment.

This offer is contingent upon all of the following being accomplished before Sept 12, 2016:

1. The approval of an employment agreement between you and Saint Vincent Hospital for the year beginning September 12, 2016 in accordance with the policies of Saint Vincent Hospital's parent corporation.
2. You have met all of the requirements of the Massachusetts Board of Registration in Medicine to be licensed.

You acknowledge by signing below receipt of this letter and you agree that there shall be no legally binding agreement between us until the conditions noted above are satisfied.

Sincerely,

David A. Bader MD FACR
Chief of Radiology
Director, Radiology Residency Program
Saint Vincent Hospital

Please indicate your acceptance of our offer by signing, dating and electronically returning this letter to Alice Persico no later than August 3, 2016. Please also mail the original signed letter.

Name: _ASHU GARG_    Date: _8/2/2016_

WORCESTER MEDICAL CENTER
123 SUMMER STREET · WORCESTER, MA 01608
(508) 363-5000 · TOLL FREE: (877) 633-2368 · STVINCENTHOSPITAL.COM

# EXHIBIT B

# RESIDENT AGREEMENT

**THIS RESIDENT PHYSICIAN EMPLOYMENT AGREEMENT** is made and executed in Worcester, Massachusetts, as of this _9th_ day of _Sept_, 2016 by and between VHS Acquisition Subsidiary Number 7, Inc., a Delaware corporation doing business as Saint Vincent Hospital ("Hospital") and Ashu Garg, MD ("Resident Physician").

## RECITALS

**WHEREAS,** Hospital is operating a health care institution known as Saint Vincent Hospital, located at 123 Summer Street, Worcester, Massachusetts 01608; and

**WHEREAS,** Hospital has established a Residency Training Program ("Program") as a way to provide quality healthcare and quality clinical education for Resident Physician; and

**WHEREAS,** Hospital desires to enroll Resident Physician in Hospital's Residency Training Program, and Resident Physician is willing and desirous to participate under mutually satisfactory terms and conditions;

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, Hospital and Resident Physician agree:

## AGREEMENT

1.    **RESIDENT APPOINTMENT.** Hospital offers and Resident Physician hereby accepts an appointment as Resident Physician in the Department of Radiology Residency Program for PGY4.

If Resident Physician is offered and accepts to continue as a Resident Physician during the second Resident Year of this Agreement, Resident will be appointed as a Resident Physician in the Department of Radiology Residency Program in the PGY2 level in Hospital's Training Program, during the second Resident Year (generally June 27, 2016 through June 30, 2017 or as otherwise specified) of this Agreement.

If Resident Physician is offered and accepts to continue as a Resident Physician during the third Resident Year of this Agreement, Resident will be appointed as a Resident Physician in the Department of Radiology Residency Program in the PGY3 level in Hospital's Training Program, during the third Resident Year (generally June 27, 2016 through June 30, 2017 or as otherwise specified) of this Agreement.

If Resident Physician is offered and accepts to continue as a Resident Physician during the fourth Resident Year of this Agreement, Resident will be appointed as a Resident Physician in the Department of Radiology Residency Program in the PGY4 level in Hospital's Training Program, during the fourth Resident Year (generally June 27, 2016 through June 30, 2017 or as otherwise specified) of this Agreement.

If Resident Physician is offered and accepts to continue as a Resident Physician during the fifth Resident Year of this Agreement, Resident will be appointed as a Resident Physician in the

Department of Radiology Residency Program in the PGY5 level in Hospital's Training Program, during the fifth Resident Year (generally June 27, 2016 through June 30, 2017 or as otherwise specified) of this Agreement.

2.     **COMPENSATION.**

a)     **PGY1.**  During the Initial Term of this Agreement, as a PGY1, Hospital shall compensate Resident Physician at the annual rate of $ $55,944.53 (prorated to a biweekly pay period amount for the Initial Term), corresponding to Hospital's 26-period accounting system.

b)     **PGY2.** If Resident Physician is offered, and accepts appointment as a PGY2 during the Renewal Term (if any) of this Agreement, Hospital shall compensate Resident Physician at the rate of $57,483.09 or the then-current salary for a PGY2 physician trainee, corresponding to ospital's 26-period accounting system.

c)     **PGY3.** If Resident Physician is offered, and accepts appointment as a PGY3 during the Renewal Term (if any) of this Agreement, Hospital shall compensate Resident Physician at the rate of $59,081.08 or the then-current salary for a PGY3 physician trainee, corresponding to Hospital's 26-period accounting system.

d)     **PGY4.** If Resident Physician is offered, and accepts appointment as a PGY4 during the Renewal Term (if any) of this Agreement, Hospital shall compensate Resident Physician at the rate of $60,609.34 or the then-current salary for a PGY4 physician trainee, corresponding to Hospital's 26-period accounting system.

e)     **PGY5.** If Resident Physician is offered, and accepts appointment as a PGY5 during the Renewal Term (if any) of this Agreement, Hospital shall compensate Resident Physician at the rate of $ $62,938.89 or the then-current salary for a PGY5 physician trainee, corresponding to Hospital's 26-period accounting system.

f)     The Base Salary shall be payable to Resident Physicians in bi-weekly installments. Notwithstanding the foregoing, no compensation shall be payable to Resident Physician for any administrative services

g)     **BENEFITS.** Resident Physician shall be entitled to the benefits described in Exhibit C, provided, however, that Exhibit C identifies the benefits currently available to resident physicians at Hospital and such benefits are subject to modification amendment from time to time by Hospital at Hospital's sole discretion.

3.     **TERM & TERMINATION.**

a)     **INITIAL TERM.**

The initial term of this agreement begins on June 27, 2016, and ends June 30, 2017 (unless otherwise specified). If resident has not completed Hospital's orientation program the term of this agreement is June 27, 2016 through June 30, 2017.

b)    **RENEWAL TERM.**

(i)    **Notice of Renewal/Non-Renewal.** If Hospital, in its sole discretion, offers the Resident Physician the opportunity to renew this Agreement for an additional term of twelve (12) months, Hospital will provide Resident Physician with written notice not less than four (4) months before the expiration of the Initial Term, unless the primary reason(s) for the non-renewal occurs within the four (4) months prior to the end of this Agreement. In that event, Hospital shall provide Resident Physician with at least five (5) days' notice of nonrenewal before the end of the Initial Term or applicable Renewal Term.

(ii)    **Resident Obligation to Respond.** If Hospital offers a Renewal Term to Resident Physician, he or she must accept or reject Hospital's offer for renewal of the Agreement within ten (10) days after receipt of the offer.

(c)    **DISCIPLINARY ACTION.**

At any time, if the Program Director of the Residency Program determines that the Resident Physician has failed to fulfill any obligation under this Agreement, such failure is cause for the termination of this Agreement. In the discretion of the Program Director, other disciplinary action may be imposed.

(i)    **Resident's Right to Appeal/Grievance Process.** Resident Physician may appeal any termination or disciplinary action through the Grievance Process. Information regarding this process and applicable procedures may be obtained from the Hospital Intranet.

(ii)    **Obligation at Termination of this Agreement.** Upon termination of this Agreement for any reason, Resident Physician shall return all Hospital property, including but not limited to books, equipment, digital pager and uniforms, and shall complete all records and satisfy all professional and financial obligations. Upon termination of this Agreement, any and all rights to further payments under this Agreement shall terminate without further notice or action being required by Hospital; provided, however, that Hospital shall pay to Resident Physician any sums which accrued to Resident Physician on or before the date of termination. Any amounts due to Resident Physician shall be paid within sixty (60) days after this Agreement is terminated.

d)    **TERMINATION.**

Notwithstanding any other provision of this Agreement, this Agreement may be terminated:

        (i)    At any time by mutual agreement of the parties; or
        (ii)    As provided for in the Hospital's Graduate Medical Education Policy.

4.    **RESIDENT'S OBLIGATIONS, DUTIES & REPRESENTATIONS.**

a)    **EDUCATION, TRAINING & LICENSURE.**

3

Resident Physician represents that he/she is a Medical Doctor and that he/she has a valid license to practice medicine in the Commonwealth of Massachusetts. (Commonwealth)

(i) **Licensure Revocation, Suspension or Other Action.** If Resident Physician's license to practice medicine in the Commonwealth is revoked, suspended or otherwise subjected to discipline, then this Agreement shall automatically terminate as of the date of such revocation, suspension, or other disciplinary action.

(ii) **Required Notice.** Resident Physician further agrees to provide the Hospital with prompt written notice if any action is taken against Resident Physician's license to practice medicine in the Commonwealth of Massachusetts or any other jurisdiction in which Resident Physician holds (or has held) a license to practice medicine, whether such action is of a temporary or permanent nature, or in the event that Resident Physician is subject to disciplinary action of any kind. The Hospital may, at its option, immediately terminate this Agreement upon or after commencement of any such disciplinary proceedings or other action.

b) **MANAGED CARE PARTICIPATION.** Resident Physician acknowledges that Hospital has entered into contracts to provide managed care, and may enter into additional managed care contracts in the future. As used herein the term "managed care" shall mean care provided by Health Maintenance Organizations, Preferred Provider Organizations, Prepaid Medical Plans and other similar healthcare systems. Resident Physician agrees to comply with the terms of all managed care arrangements in which Hospital participates now or in the future to the extent such terms do not conflict with the standards of the Accreditation Council on Graduate Medical Education.

c) **SUPERVISION, RULES & REGULATIONS.**

(i) **SUPERVISION.** Resident Physician shall be directly responsible to the Program Director of the Residency Program ("Program Director").

(ii) **RULES & REGULATIONS.** Resident Physician shall abide at all times by the Hospital's House Staff Manual, and the bylaws, rules and regulations, and policies and procedures of the Medical Staff and the Hospital, and shall conduct himself/herself in a professional manner. The Resident Physician also understands and agrees that the Hospital may, at its discretion, change or modify the aforesaid House Staff Manual, and the bylaws, rules and regulations, and policies and procedures of the Medical Staff and the Hospital and agrees to keep himself/herself appraised of the contents thereof at all times during the course of this Agreement.

d) **ABILITY TO FULFILL PROGRAM OBLIGATIONS/HEALTH REQUIREMENTS.**

(i) Resident Physician must be fully capable of participating in the Program, with or without a reasonable accommodation. Once Resident Physician has applied for admission to and is conditionally accepted by the Program, Resident Physician shall be required to undergo a complete physical examination, including blood test and drug screen, to confirm that Resident Physician is fully capable of participating in the Program, with or without a reasonable

4

accommodation.

(ii)    In addition, Hospital may require evidence that the Resident Physician has been immunized against various viruses and may require that Resident Physician periodically take certain routine laboratory tests and chest x-rays.

(iii)    **Illness/Injury.** In the event that Resident Physician is absent due to illness or injury, a Hospital staff physician prior to returning to work must clear Resident Physician. Hospital shall provide emergency first aid treatment to Resident Physician in the event that Resident Physician needs such care until the personal physician of Resident Physician can be summoned, but shall not be obligated to furnish any other medical or surgical services to Resident Physician and Hospital shall not be responsible for any costs involved in such treatment, any follow-up care, or any hospitalization.

e)    RESIDENT EDUCATION, TRAINING & PROGRAM REQUIREMENTS.

(i)    Resident Physician agrees to fulfill the educational requirements of the Program and the obligations to provide appropriate patient care as assigned by the Program Director or the Medical Director of the clinical service to which the Resident Physician may be assigned from time to time. Resident Physician shall maintain proper professional conduct and appearance and demonstrate courtesy and respect to patients, their families and all persons employed by or associated with Hospital.

(ii)    Resident Physician shall attend all education conferences required by the Program Director or the Medical Director of the clinical service to which Resident Physician is assigned from time to time, unless Resident Physician is engaged in the emergency care of patients or specifically directed to perform other responsibilities by the Program Director or said clinical service Medical Director. Resident Physician shall participate as directed by the Program Director in related medical education programs provided through the Hospital's affiliation with universities or other educational facilities.

(iii)    In addition to fulfillment of the education, training and program requirements defined hereinabove, all PGY-2 through PGY-5 may engage in an optional clinical experience to work supervised shifts at Saint Vincent Hospital in order to expand his/her clinical skills, upon request and contingent upon approval by Residency Program Director ("Elective Rotation"). Physician shall be compensated for each hour of supervised patient care services provided ("Hourly Compensation") during an Elective Rotation as described in "Exhibit B" attached hereto and incorporated herein.

5.    HOSPITAL'S RIGHTS, OBLIGATIONS & DUTIES.

a)    TRAINING PARTICIPATION. Hospital may refuse access to its clinical areas to Resident Physician if Resident Physician does not meet Hospital's employee standards for safety, health, or ethical behavior.

b) **BILLING.** Hospital solely shall bill for all professional services rendered by the Resident Physician. Any and all fees received in connection with such billed services, including all fees and payments of any nature in payment for managed care services rendered by Resident Physician, belong to Hospital and should be paid as received to Hospital and, if payable to Resident Physician shall be assigned to or endorsed promptly to Hospital by Resident Physician. Resident Physician shall not bill or collect from any payor or patient any sums for professional services rendered by Resident Physician under this Agreement.

c) **RESIDENCY TRAINING PROGRAM.** Hospital shall provide a program of education that meets the standards established by the Accreditation Council on Graduate Medical Education.

6. **MISCELLANEOUS PROVISIONS.**

a) **INCORPORATION.** THIS Agreement embodies the complete, full and exclusive understanding of the Hospital and the Resident Physician with respect to the Resident Physician's employment by Hospital, and it supersedes and cancels all prior agreements, written or oral, between the parties hereto regarding the Resident Physician's employment by Hospital. Any amendments, additions, or supplements to or cancellation of this Agreement shall be effective and binding on the Hospital and the Resident Physician only if in writing and signed by both parties.

b) **PARTIAL INVALIDITY.** In the event that any provision of this Agreement is deemed to be invalid or unenforceable by any court of competent jurisdiction, such provision shall be deemed to be restricted in scope or otherwise modified to the extent necessary to render the same valid and enforceable, or, in the event that such provision cannot be modified or restricted so as to be valid and enforceable, then the same shall be deemed excised from this Agreement if circumstances so require, and this Agreement shall be construed and enforced as if such provision had originally been incorporated herein as so restricted or modified, or as if such provision had not originally been contained herein, as the case may be.

c) **NOTICE.** Any written notice given under this Agreement by the parties shall be addressed to the addressee at the address of such addressee at the place identified on the signature page below, unless prior written notice of a change of address has been furnished.

*With copy to:*  Tenet Healthcare
1445 Ross Avenue
Suite 1400
Dallas, Texas 75202
Attn: Law Department

d) **APPLICABLE LAW.** This Agreement shall be construed in accordance with the laws of the Commonwealth. The provisions of this Section shall survive expiration or termination of this Agreement regardless of the use of such termination.

e) **COMPLIANCE OBLIGATIONS.** Resident Physician represents that he/she read, understands, and shall abide by Tenet's Standards of Conduct. Resident Physician shall comply with Tenet's Compliance Program and Tenet's policies and procedures related to the Deficit

Reduction Act of 2005, Anti-Kickback Statute and the Stark Law. Tenet's Standards of Conduct, summary of Compliance Program, and policies and procedures, including a summary of the Federal False Claims Act and applicable state false claims laws (collectively "False Claims Laws") with descriptions of penalties and whistleblower protections pertaining to such laws, are available at: http://www.tenethealth.com/about/ethics-compliance. Further, the parties to this Agreement certify that they shall not violate the Anti-Kickback Statute and Stark Law, and shall abide by the Deficit Reduction Act of 2005, as applicable, in providing services to Hospital. Resident Physician shall complete any training required under Tenet's Compliance Program.

**IN WITNESS WHEREOF,** Hospital has caused this Agreement to be executed by its duly authorized officer, and the Resident Physician has executed this Agreement by hereunto setting his/her hand effective as of the day and year first above written.

Hospital:
VHS ACQUISITION SUBSIDIARY
NUMBER 7, INC. D/B/A SAINT VINCENT
HOSPITAL

_____
Steven MacLauchlan
President and Chief Executive Officer
Saint Vincent Hospital
123 Summer Street
Worcester, MA 01608
Date: 9/12/16

Resident:
Ashu Garg

_____
Ashu Garg
Address: 65 Lake Avenue
Unit #824, Worcester, MA

Date: 9/12/2016

## *EXHIBIT A*
## **JOB DESCRIPTION**
## *Department of Radiology*

### *A.*    *Duties and Responsibilities*

The fully accredited radiology residency program at St. Vincent Hospital is a four-year radiology residency program for PGY levels 2 through 5. Throughout the four years of training there is a graduated exposure to all facets of diagnostic radiology, interventional radiology, and nuclear medicine. Successful completion of the radiology residency program fulfills requirements of Board eligibility as defined by the American Board of Radiology. Training requirements and departmental policies are detailed in the Radiology Resident Manual which is distributed and reviewed with each resident.

8

## *EXHIBIT B*
### *Radiology Resident Physician Elective Rotation*

### *GENERAL SUMMARY:*

Upon approval of the Program Director of Residency Training Program and under the guidance of the Medical Director of Hospitalist Program, the Resident Physician will be responsible for the supervised provision of care to patients admitted to the Hospitalist Service. Residency Program faculty, Medical Director of Hospitalist Program and/or attending physicians will be available at least by telephone at all times during Resident Physician's Elective Rotation to answer questions and, if Resident Physician requests in person supervision on site, in person supervision will be available within 30 minutes. The Duties and Responsibilities described herein may be changed from time to time at the discretion of Hospital.

Residents shall be compensated for each hour of supervised patient care services provided ("Hourly Compensation") during an Elective Rotation as described incorporated herein:

### *PGY2 and PGY3 Elective Radiology Rotation Compensation*

All PGY2 and PGY3 Radiology Residents may engage in an optional clinical experience to work supervised shifts at Saint Vincent Hospital in order to expand his/her clinical skills, upon request and contingent upon approval by Residency Program Director ("Elective Rotation").

Residents shall be compensated Fifty-Five Dollars ($55.00) for each hour of supervised patient care services provided ("Hourly Compensation") during an Elective Rotation as described and incorporated herein.

### *PGY4, PGY5 and PGY6 Elective Radiology Rotation Agreement*

All PGY4 through PGY6 Radiology Residents may engage in an optional clinical experience to work supervised shifts at Saint Vincent Hospital in order to expand his/her clinical skills, upon request and contingent upon approval by Residency Program Director ("Elective Rotation").

Residents shall be compensated for each hour of supervised patient care services provided ("Hourly Compensation") during an Elective Rotation as described incorporated herein:

- During the hours of 7:00 a.m. and 3:00 p.m. Radiology Residents shall be compensated One Hundred and Twenty Dollars ($120.00) per hour;

- During the hours of 3:00 p.m. and 11:00 p.m. Radiology Residents shall be compensated One Hundred and Twenty Dollars ($120.00) per hour; and

- During the hours of 11:00 p.m. and 7:00 a.m. Radiology Residents shall be compensated One Hundred and Thirty ($130.00) per hour.

A.    **Clinical Responsibilities of Elective Rotation**

1.    Provides services as a Resident Physician to unassigned patients and patients admitted to the Hospitalist Service.  May also provide consultative services to other inpatients.

2.    Resident Physician will perform initial evaluation on unassigned patients, patients admitted to the Hospitalist Service, and those other patients as requested by the attending physician of record, or their coverage (private patients).

3.    Resident Physician may be required to perform initial history and physical examination ("H&P") with a written plan of management and orders for all patients evaluated during work hours. Each such H&P shall include the following:

- Chief complaint;
- Details of the present illness;
- Relevant past, social and family history;
- Allergies;
- Relevant review of systems;
- Physical examination to include inventory of body systems and vital signs;
- Conclusions or impressions; and
- Course of action or plan.

4.    It is the Resident Physician's responsibility to obtain alternative coverage by a substitute physician if he/she is unable to provide coverage for a previously scheduled shift,  provided that (1) the substitute physician is a member of the medical staff of Saint Vincent Hospital, and (2) the substitute physician meets or exceeds all of the professional qualifications required of Resident Physician hereunder, and (3) Medical Director of the Hospitalist Program gives prior approval of the substitute.

5.  Resident Physician will be expected to present interesting or difficult cases, depending on their value as teaching cases or the acuity of the patient's illness, the morning following his/her Elective Rotation and feedback will be provided regarding Resident Physician's clinical work and written documentation of cases. Resident Physician will also be required to provide supervision and teaching of junior residents and medical students.

B.    **General Duties and Responsibilities**

1.    Resident Physician will complete all patient medical records in accordance with applicable by-laws, policies, and procedures of Hospital and/or the applicable facility.  Resident Physician agrees to document patient visits in accordance with Federal, State, and payor regulations. Documentation will be completed by the end of the visit day.

2.    Resident Physician will consistently treat all Hospital employees in a professional, respectful manner.

3. Resident Physician will consistently treat all Hospital patients in a professional, respectful manner.

4. Resident Physician is expected to see all patients presenting to the Hospitalist Service or Intensive Care Units, without regard to race, sex, religion, financial status, or insurance class.

5. Resident Physician will participate in and cooperate with the Quality Improvement and Quality Management programs and procedures of Hospital.

6. Resident Physician shall comply with all rules, regulations, and policies established by Hospital, the Occupational Health and Safety Administration, all Federal, State, and local agencies, and other accreditation organizations.

7. Resident Physician shall assist Hospital in the investigation, documentation, and resolution of any issue arising out of Hospital's dealings with peer review and other agencies relating to Hospital practice sites.

## *EXHIBIT C*
## *Saint Vincent Hospital Benefit Summary*
## *House Staff Residency Training Program*

The following is intended to briefly describe the various benefits afforded to you. The full plan documents may be found on HealthyatTenet.com. Benefits are subject to the terms of the plan documents or insurance contracts, as applicable, and may be changed at the discretion of Hospital.

## BENEFIT PROGRAM:

Saint Vincent Hospital offers a comprehensive benefits program which allows you to enroll in a variety of benefits including health, dental, vision, disability group term life insurance as well as pre-taxed Flexible Spending Accounts and a 401(k) plan with discretionary matching contributions. During your orientation program, you will be given a packet explaining the benefits offered.

*Please be advised that if you are a J-1 Exchange Visitor, the hospital does not offer a health insurance plan that meets the requirements under federal law for foreign medical graduates. You will need to secure that coverage independently and information regarding such insurance will be provided to you by Human Resources. Because of the limited coverage offered through the independent, qualifying health plan, you are strongly encouraged to also participate in the hospital's health plan in addition to securing the required coverage under federal law.*

| PGY 1 | $55,944.53 |
|-------|-----------|
| PGY 2 | $57,483.09 |
| PGY 3 | $59,081.08 |
| PGY 4 | $60,609.34 |
| PGY 5 | $62,938.89 |
| PGY 6 | $65,258.14 |
| PGY 7 | $66,835.56 |
| PGY 8 | $68,449.55 |

## *TIME OFF:*

Twenty (20) paid days off per residency year (prorated for part time) to be used in accordance with the policies of the Internal Medicine Residency Program (includes continuing medical education days); paid days off may not be carried over to any subsequent Agreement and unused days off will not be reimbursed. Any additional unpaid time off taken will follow requirements as per the Internal Medicine Residency Program.

### SICK TIME:

Any accrued sick time remaining at the end of the Agreement term may not be carried into any subsequent Agreement. Unused accrued sick time will not be reimbursed. All sick time is to be used in accordance with the policies of the Internal Medicine Residency Program.

### ADDITIONAL BENEFITS:

### ON-CALL MEALS:

Meal tickets are provided per on-call shift.

### EDUCATIONAL ALLOWANCE:

With prior approval of Program Director the Hospital shall provide a monetary educational allowance ("Allowance") for use by Resident Physician during the term of this Agreement. Such Allowance must be used for such educational purposes as may be approved in advance by Hospital, including, but not limited to, medical books, membership dues in applicable medical associations and registration for Board examinations. This allowance will not be paid by Hospital until reviewed and approved in accordance with Saint Vincent Hospital Policy.

### EXHIBIT D
### POLICIES AND PROCEDURES

The following is intended to identify administrative policies and procedures relevant to you as a resident at Saint Vincent Hospital. The full policy statements may be found in The Internal Medicine Residency Resident Physician Manual, The Saint Vincent Hospital Human Resources/eTenet Policies and on The Saint Vincent Hospital Intranet.

1.     Resident Physicians are subject to the rules, regulations, accountabilities and standards of conduct applicable to all members of the medical staff and to all members of the medical profession.

2.     In addition, Resident Physicians shall abide by the Hospital policies, standards, rules, regulations, requirements and procedures.  Policies and Procedure are located in/on:

- The Internal Medicine Residency Resident Physician Manual
- The Saint Vincent Hospital Human Resources/eTenet Policies
- The Saint Vincent Hospital Intranet

# EXHIBIT C

# Summary of Group/Resident Evaluations All Evaluations



**Saint Vincent Hospital**
Worcester Medical Center
*Department of*
*Radiology*

## Saint Vincent Hospital - Radiology

*Report Date/Time: 12/21/2016 3:25:49 PM*

***Report Date Range:*** 07/01/2016 - 12/21/2016
***Rotation:*** ER

***Competency*** = Average score on competency for selected Residents

***Group*** = Average score of all PGYs represented

***Total*** = Average score of all PGYs

Evaluation Name: **\*ER Rotation**

**Interpersonal and Communication Skills** - Category Summary (2.00, 50.0%)

| Question | AGarg15 | Group | Total |
|---|---|---|---|
| Communication Skills | 2.00 (n=1)<br>50.00% | 2.00 (n=1)<br>50.00% | 2.00 (n=1)<br>50.00% |
| **Scale of 1-4 (1=lowest and 4=highest)*(See Bottom)*** | | | |

**Medical Knowledge** - Category Summary (2.00, 50.0%)

| Question | AGarg15 | Group | Total |
|---|---|---|---|
| What is the level of this Resident's general radiology knowledge? | 2.00 (n=1)<br>50.00% | 2.00 (n=1)<br>50.00% | 2.00 (n=1)<br>50.00% |
| **Scale of 1-4 (1=lowest and 4=highest)*(See Bottom)*** | | | |

**Patient Care and Procedural Skills** - Category Summary (N/A)

| Question | AGarg15 | Group | Total |
|---|---|---|---|
| Demonstrate proper technique in planning and performing image-guided procedures | 0.00 (n=0)<br>0.00% | 0.00 (n=0)<br>0.00% | 0.00 (n=0)<br>0.00% |
| **Scale of 1-4 (1=lowest and 4=highest)*(See Bottom)*** | | | |

**Practice-Based Learning and Improvement** - Category Summary (2.00, 50.0%)

| Question | AGarg15 | Group | Total |
|---|---|---|---|
| Recognize and correct personal errors | 2.00 (n=1)<br>50.00% | 2.00 (n=1)<br>50.00% | 2.00 (n=1)<br>50.00% |
| **Scale of 1-4 (1=lowest and 4=highest)*(See Bottom)*** | | | |

**Professionalism** - Category Summary (4.00, 100.0%)

| Question | AGarg15 | Group | Total |
|---|---|---|---|
| Demonstrate a responsible work ethic with regard to conference attendance, work assignments, and general availability | 4.00 (n=1) 100.00% | 4.00 (n=1) 100.00% | 4.00 (n=1) 100.00% |
| **Scale of 1-4 (1=lowest and 4=highest)***(See Bottom)* | | | |

**System-Based Practices** - Category Summary (2.00, 50.0%)

| Question | AGarg15 | Group | Total |
|---|---|---|---|
| Demonstrates ability to work in interprofessional teams to enhance patient safety and improve patient care quality. | 2.00 (n=1) 50.00% | 2.00 (n=1) 50.00% | 2.00 (n=1) 50.00% |
| **Scale of 1-4 (1=lowest and 4=highest)***(See Bottom)* | | | |

**Clinical Judgment** - Category Summary (1.00, 25.0%)

| Question | AGarg15 | Group | Total |
|---|---|---|---|
| How well does this Resident make diagnostic decisions? | 1.00 (n=1) 25.00% | 1.00 (n=1) 25.00% | 1.00 (n=1) 25.00% |
| **Scale of 1-4 (1=lowest and 4=highest)***(See Bottom)* | | | |

**Comments Section**

**Dr. Ashu Garg**

- Evaluation Comments - Susana Candia, Radiology - Genitourinary Imaging (Rotation:ER): Weakness comes through in applying his knowledge to make the most reasonable/likely diagnoses.

Is working hard to fix deficiencies. Is looking for difficult cases to review. Brings cases to review with attendings. Is taking to heart a comment I made to him regarding his interactions with providers on the phone and is working to better choose wording to indicate in his reports and conversations his level of certainty regarding a diagnosis.

Shows up before most other residents. Stays late. . *Did you provide direct feedback on this evaluation?: Yes. Signed - Dr. Susana Candia*

**Additional Comments:**
Explanation for a score of 1.00 out of 4 under Clinical Judgment for the curricular milestone: While Ashu's radiology knowledgebase is comparable to peers, his ability to apply his knowledge to make a diagnosis lags behind. This becomes most apparent with complicated cases. To this end, he is actively seeking out difficult saved cases from others to improve himself and I applaud that.

- Program Director Comments - Not Filed

**Optional Confidential Comments Section:**

| **Dr. Ashu Garg** |
|---|
| Comments Not Available |

12/21/2016                              Summary of Resident Evaluations Report

| Statistical Analysis Based on a Scale of 1-4 | | | | | |
|---|---|---|---|---|---|
| n | Std Dev | Median | Mean | Variance | High & Low |
| 1 | 0.9 | 2 | 2.17 | 0.81 | 4 & 1 |

**THE FOLLOWING ANSWER SCALE WAS USED:**

**Performance Rating (Five)**

| |
|---|
| 0 - Not Observed |
| 1 - Unsatisfactory Needs Improvement |
| 2 - Satisfactory |
| 3 - Above Average |
| 4 - Exceptional |

# End of *ER Rotation Section...

# EXHIBIT D



SAINT VINCENT HOSPITAL

January 20, 2017

To whom it may concern,

This is a letter of reference for Dr. Ashu Garg who is applying for your vascular interventional radiology fellowship.

Dr. Garg recently transferred into our program at the R3 level on 9/12/16. In his initial months with us he has been transitioning into our workflow and on-call responsibilities and has not yet been assigned to a procedural rotation. To that end I cannot comment specifically on his vascular-interventional skill set. I would refer you to his personal statement and CV which reveal significant prior professional and personal experience, including a year of orthopedic surgical training followed by a general surgery residency and surgical oncology fellowship in India. He followed this up with a general surgical internship at University of Illinois prior to beginning his radiology residency training at the University of Oklahoma.

Ashu is highly motivated and passionate about achieving his goals.

Please contact me directly if there is any additional information I can provide at this time.

Sincerely,

*David A. Bader MD FACR*
*Chief of Radiology*
*Radiology Residency Program Director*
*St. Vincent Hospital*
*123 Summer St.*
*Worcester, MA 01608*
*P: 508 363-6060*
*F: 508 363-9236*

Scanned by CamScanner

# EXHIBIT E



# SAINT VINCENT HOSPITAL

January 20, 2017

Dear Sir or Madam,

As Associate Chief of Radiology and Associate Program Director, I have worked with Ashu Garg, MD for the last 4 months in clinical and academic capacities.

Since Ashu joined our program, he has demonstrated a strong knowledge base and constantly seeks improvement.

Ashu has been steadily working to increase his case volume. His rotations to date have included Nuclear Medicine, ER, Ultrasound, and Mammography.

In addition, Ashu also demonstrates an affable personality, and gets along well with those around him.

Please feel free to contact me for any additional information I may be able to provide.

Sincerely,

Brian Midkiff, MD, MPH
Associate Chief of Radiology
Associate Residency Program Director
Division Director of Ultrasound
Saint Vincent Hospital
123 Summer St.
Worcester, MA 01608
(508) 363-6060
brian.midkiff@stvincenthospital.com

---

WORCESTER MEDICAL CENTER
123 SUMMER STREET · WORCESTER, MA 01608
(508) 363-5000 · TOLL FREE: (877) 633-2368 · STVINCENTHOSPITAL.COM

Scanned by CamScanner



SAINT VINCENT HOSPITAL

January 23, 2017

To whom it may concern:

I am writing this letter on behalf of Dr. Ashu Garg in support of his application to your Fellowship program in Vascular and Interventional Radiology.

Ashu is currently a diagnostic radiology resident at St. Vincent Hospital, a recent transfer from University of Oklahoma. Ashu has had extensive surgical training in India, which I am sure will serve him well in his Interventional Radiology training and career. While I have not yet worked with Ashu in a procedural setting, I have enjoyed our diagnostic rotations together. He has a calm and mature demeanor and he approaches diagnostic US, CT and plain film cases with an obvious clinical perspective. In our discussions, he has demonstrated understanding of complex surgical and anatomic principles.

In conclusion, while I have not yet had the pleasure of working with Ashu directly on an Interventional rotation, I can attest to his positive attitude and surgical/clinical/anatomic base of knowledge.

Please do not hesitate to contact me if you have any questions,

Sincerely,

Gregory Berberian, M.D.
Acting Director, Vascular and Interventional Radiology
St. Vincent Hospital
123 Summer St, Worcester, Ma 01608
Cell-781-367-9169

Scanned by CamScanner

# EXHIBIT F



**SAINT VINCENT HOSPITAL**

February 14, 2017

The American Board of Radiology
5441E. Williams Circle
Tucson, AZ 85711

To Whom It May Concern,

Dr. Ashu Garg joined our program as a R3/PGY-4 resident on September 12, 2016 and is anticipated to complete his training on June 30, 2018. Previously Dr. Ashu Garg was a resident in Diagnostic Radiology residency program at University of Oklahoma Health Science Center from July 1, 2013 to June 30, 2016.

Sincerely,

David A. Bader, MD FACR
Chief of Radiology
Radiology Residency Program Director

Scanned by CamScanner

# EXHIBIT G



SAINT VINCENT HOSPITAL

February 22, 2017

The American Board of Radiology
5441E. Williams Circle
Tucson, AZ 85711

To Whom It May Concern,

Dr. Ashu Garg joined our program as a R3/PGY-4 resident on September 12, 2016 and is anticipated to complete his training on June 30, 2018. In order to gain an additional 2 ½ months of training, Dr. Garg is willing to use his vacation time and additionally, he is willing to work on weekends without violating any duty hour's restrictions.

Sincerely,

David A. Bader, MD FACR
Chief of Radiology
Radiology Residency Program Director

Scanned by CamScanner

# EXHIBIT H

 **Gmail**

ashu garg &lt;drashugarg@gmail.com&gt;

## Handover sheet night call

2 messages

---

**ashu garg** &lt;drashugarg@gmail.com&gt;
To: susana.candia@stvincenthospital.com
Cc: "Parikh, Salonee" &lt;salonee.parikh@stvincenthospital.com&gt;

Tue, Apr 18, 2017 at 8:12 AM

Dear Dr. Candia,

Hi I forgot to get your signature and submit the night float handover sheet . There is nothing pending.

Ms. Parikh, I will give you the signed sheet tomorrow.

Thank you.

Ashu

---

**Parikh, Salonee** &lt;Salonee.Parikh@stvincenthospital.com&gt;
To: ashu garg &lt;drashugarg@gmail.com&gt;

Tue, Apr 18, 2017 at 8:13 AM

Thank you.


*Salonee Parikh, M.S.*

Radiology Residency Program Coordinator

x27034



**From:** ashu garg [mailto:drashugarg@gmail.com]
**Sent:** Tuesday, April 18, 2017 8:13 AM
**To:** Candia, Susana
**Cc:** Parikh, Salonee
**Subject:** Handover sheet night call

[Quoted text hidden]

This message (including any attachments) is confidential and intended solely for the use of the individual or entity to whom it is addressed, and is protected by law. If you are not the intended recipient, please delete the message (including any attachments) and notify the originator that you received the message in error. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. Any views expressed in this message are those of the individual sender, except where the sender specifies and with authority, states them to be the views of Tenet Healthcare Corporation.

8/7/2017

Case 5:21-mc-00005-R Document 3-1 Filed 10/19/21 Page 52 of 86
Case 4:20-cv-40060-DHH Document 1-1 Filed 05/28/20 Page 3 of 4
Morning signout

# RE: Morning signout

**Bader, David**
**Sent:** Tuesday, April 18, 2017 9:25 AM
**To:** Kanzaria, Paulomi; Garg, Ashu

Ashu,

I just want to reiterate that sign-out and completion of the transition-in-care form is a required responsibility. Documentation of continuity of care is required by the ACGME and if it is not being done than I am concerned that you may not aware of why we do it.

Please see me for any questions.

*-Dr. Bader*

---

**From:** Kanzaria, Paulomi
**Sent:** Tuesday, April 18, 2017 8:16 AM
**To:** Garg, Ashu
**Cc:** Bader, David
**Subject:** Morning signout

Ashu,

I had specifically reminded you just yesterday, to sign-out in the morning before leaving with the CT 1 attending. Dr. Candia was waiting for you to sign out but we were told you had already left.

Please do not fail to do so when you are next on FNF/NF.

Thank you,
Dr. K

# RE: Morning signout

Garg, Ashu

**Sent:** Tuesday, April 18, 2017 10:28 PM
**To:** Bader, David; Kanzaria, Paulomi

Dr. Bader,

My apology. I forget this morning.

After reaching the home I realized that I forgot to fill the sign out sheet. I sent an
immediate email to Dr. Candia stating that there is nothing pending. Thank you for
reminding me. I will make sure that this will not happen in future.

Thanks.

Ashu

---

From: Bader, David
Sent: Tuesday, April 18, 2017 9:25 AM
To: Kanzaria, Paulomi; Garg, Ashu
Subject: RE: Morning signout

Ashu,

I just want to reiterate that sign-out and completion of the transition-in-care form is a
required responsibility. Documentation of continuity of care is required by the ACGME and
if it is not being done than I am concerned that you may not aware of why we do it.

Please see me for any questions.

-Dr. Bader

From: Kanzaria, Paulomi
Sent: Tuesday, April 18, 2017 8:16 AM
To: Garg, Ashu
Cc: Bader, David
Subject: Morning signout

Ashu,

I had specifically reminded you just yesterday, to sign-out in the morning before leaving
with the CT 1 attending. Dr. Candia was waiting for you to sign out but we were told you
had already left.

Please do not fail to do so when you are next on FNF/NF.

Thank you,
Dr. K

# EXHIBIT I



# SAINT VINCENT HOSPITAL

April 26, 2017

Ashu Garg, M.D.
65 Lake Ave.,
#824,
Worcester, MA 01604

Re:     Renewal of Resident Agreement between Saint Vincent Hospital ("Hospital") and Ashu Garg,
M.D. ("Physician") effective as of July 1, 2017 ("Agreement")

Dear Dr. Garg:

This letter ("Renewal") will serve as written notice of the Hospital's desire to renew the Agreement
referenced above subject to the modification set forth below"

1.   The Agreement shall renew for a period one year commencing July 1, 2017 and expiring June
30, 2018 ("Renewal Term").

2.   Hospital offers and Resident Physician hereby accepts an appointment as Resident Physician in
the Diagnostic Radiology Residency Program for PGY - 5

3.   Hospital shall compensate Resident Physician at the rate of $64,198 as salary for a PGY - 5
physician trainee.

4.   All other terms and condition stated in the Agreement shall remain in effect throughout the
Renewal Term.

5.   To the extent there are any conflict between the terms of this Renewal and the Agreement, the
provisions of this Renewal shall prevail.

Please execute both originals of this letter and return one to me prior to the expiration of the Agreement.
If you have any questions please do not hesitate to contact me.

Sincerely,

Steve MacLauchlan
Chief Executive Officer

Date: ___4|28|17___

David A. Bader MD, FACR
Chief of Radiology
Residency Program Director
Date: ___4|26|17___

The undersigned hereby acknowledges and agrees to the terms and conditions set forth above.

Ashu Garg, M.D.

Date: ___5/15/2017___

## WORCESTER MEDICAL CENTER
123 SUMMER STREET · WORCESTER, MA 01608
(508) 363-5000 · TOLL FREE: (877) 633-2368 · STVINCENTHOSPITAL.COM

# EXHIBIT J



**SAINT VINCENT HOSPITAL**

May 3, 2017

Dear Dr. Garg,

As per the St. Vincent Hospital Graduate Medical Education Policy and Procedure Manual, this letter is a Stage Two Written Warning for performance deficiency, effective immediately. This letter prescribes the specific actions discussed and assigned to address performance issues.

As specified in your prior warning, the timetable for correction was an assessment during and following your next scheduled week of night float which was originally April 30-May 6. By your request that week was split and you had the first 3 days of night float April 15-17. Dr. Kanzaria and I then met with you on April 26 for an updated performance review. The elements reviewed and discussed with you in detail included:

- Review of expectations as detailed in your Stage One Written Warning from 2/23/17 (attached)
    - You are not meeting performance expectations for your PGY level
- Number of re-reads
    - High number of re-reads, outlier for all residents.
- Quality of reports
    - While the number of significant misses has decreased significantly, the quality and clarity of a large number of reports remains unsatisfactory. This requires significant revision time by the Faculty to assure that the findings and impression are clear to the providers.
- Timeliness of reporting
    - Significant delays in report turnaround times for ER cases. As an example, you continue to batch overnight plain films for reading after 8am. Many of these patients have already been discharged.
- Volume of cases on daily CT rotation
    - You had been counseled to be more productive on your CT daily assignments to come up to speed on your report quality and turnaround time. You have not done so. In 7 CT daily assignments from 4/10-4/20, your total number of cases read each day was 4, 12, 1, 7, 8, 2, 5. Unacceptable low numbers for any resident and particularly an R3 resident already on notice for CT reading issues. You cannot expect to improve your knowledge and performance levels without an effort to do so on a daytime rotation. You have not demonstrated satisfactory recognition, accountability, and effort to improve.
- Evaluations
    - Dr. Kanzaria and I specifically had the opportunity to read your overnight CTs from night float and our assessments as above are based on direct experience and faculty input.
- Procedure log documentation
    - Your procedure log has not been maintained nor updated. This is despite multiple notifications dating back to your semi-annual portfolio review on 2/14/17. You have offered several excuses for the delay but have yet to address the program requirement which is a core competency of professionalism.

The specific actions for this Level Two Warning is schedule modification to provide you with more educational opportunity in CT assignments and expectation that you will significantly increase your CT volume and quality during these rotations. We had considered and discussed additional night and weekend assignments and you requested that we limit it to daily rotations. We will do our best but cannot compromise the assignments of other residents in the program. To re-emphasize, this will not be successful if you do not make an effort to take advantage of the opportunities that we are providing for you. During our conversation you repeatedly brought up the boards and how an assignment change might interfere with your study time. We repeatedly tried to re-direct you to properly balance and prioritize your current serious performance issues. You acknowledged an understanding of the situation and will hopefully translate this into action going forward.

Assessment will be continuous and the next formal reevaluation of your warning status will be at the completion of your next week of night float (June 10-15, 2017). In the interim you will also have your end-of-year portfolio and milestone reviews and all performance data will be considered.

Consequences of noncompliance may include, but are not limited to those in the Saint Vincent Hospital GME Manual; additional work assignments, limitation of responsibilities, temporary suspension, non-reappointment, or dismissal from the residency program.

You have the right to initiate a formal appeal to this Stage 2 Corrective Action. Specifically, you may request that I modify or withdraw the Written Warning which must be submitted with five (5) work days after receipt.

Sincerely,

Date: 5/8/17

David A. Bader, MD., FACR
Chief of Radiology
Residency Program Director

Documentation of receipt:

Date: 5/5/17

Ashu Garg, MD.

Cc: Dr. Paulomi Kanzaria, Associate Residency Director
    Dr. Brian Midkiff, Associate Residency Director

*I do not agree with many detail as mentioned above. This does not mean that I don't want to improve. There is improvement chances at every level (Resident level, fellow level, Junior attending level & senior attending level). I am fully dedicated for my career, and I will try to do my best. Thank you.
Ashu Garg
5/5/2017*

Page 2 of 2

# EXHIBIT K

# Bader, David

| | |
|---|---|
| **From:** | Garg, Ashu |
| **Sent:** | Saturday, May 13, 2017 1:31 PM |
| **To:** | Bader, David |
| **Subject:** | RE: Nightfloat Studies |

Dear Dr. Bader,

Hi, i would just like to clarify that I am not accusing anyone. I really felt worried and uncomfortable after R4, but i dont think that a formal meeting is necessary unless you insist.

Thank you very much.

Respectfully,

Ashu Garg

**From:** Bader, David
**Sent:** Friday, May 12, 2017 12:27 PM
**To:** Garg, Ashu
**Subject:** RE: Nightfloat Studies

Dear Ashu,

Given your accusation of discrimination I will be arranging for Patty Gilmore, Human Resource Manager, to join us for a meeting.

Thank you,

-Dr. Bader

*David A. Bader MD FACR*
*Chief of Radiology*
*Radiology Residency Program Director*
*St. Vincent Hospital*
*123 Summer St.*
*Worcester, MA 01608*
*P: 508 363-6060*
*F: 508 363-9236*

**From:** Garg, Ashu
**Sent:** Friday, May 12, 2017 11:47 AM
**To:** Bader, David
**Subject:** Nightfloat Studies

Dear Dr. Bader,

I would like to bring your attention to rereads and their gradings done by Dr. Burd for my nightfloat studies (for April 15th-18th, and May 2nd- 5th). He over read my total of 29 night float studies and

1

gave 1 R4, 4 R3, 14 R2 and 2 R1 (excessive and outlier gradings in comparison to the gradings from other attendings over reads.)

I would like to bring your attention to a case on my recent night float on last friday. The study was CTA brain/neck  (MRN: W000148200) over read by Dr. Burd. He wrote an addendum ( 14 points long !!!!) and gave me R4 grading for this study, and that was for a "**may be**" finding. Even the attending was not sure if it is a true finding.   I think this was because of the fact the study was read by "Ashu Garg" and not anyone else. Also, he didn't recommend any follow up if he is really concerned about the patient care? also, why is the critical finding, if any, is point number 7 ??? if significant..

I can remember that on one of my first week of night float, I consulted Dr. Kataoka for a complicated case (I can provide the details). After discussion with Dr. Kataoka over the phone, I dictated the findings and impression in the report, as instructed by Dr. Kataoka. This same study was read by a different attending in the morning and he gave R3 grading. Was this R3 given to Dr. Kataoka by the morning attending? This raises multiple issues for appropriate and safe acute patient care in the setting of emergency.

I would like to objectively assess and know the dictated studies turnover time during my night float of April 15th-17th and May 2nd-4th by tracing the electronic foot prints. I would like to assess and calculate my average study turnover time. Also, I would like it to compare with the average study turnover time for each residents on their night float. I am looking forward to make objective assessment and statistical comparison analysis by reviewing the electronic footprints.

I just wanted to let you know this R4 grading is just an example of discrimination. In fact, there are many R3 gradings that I am not fully convinced should be R3. If you are available sometime next week, we can go over them.

Thank you for your time.

Sincerely,

Ashu Garg

# EXHIBIT L

**Saint Vincent Hospital**
**Radiology Residency Program**
**Absence Make –Up Time Form**

Resident Name: Ashu Garg

| Dates Absent | Make Up - Dates |
|---|---|
| February 9th, 2017 (Full Day) | June 17th, 2017 (Full day) |
| March 13th, 2017 (Half Day) | June 2nd, 2017 (Half day) |
| March 15th, 2017 (Half Day) | June 23rd, 2017 (Half day) |
| April 7th, 2017 (Full Day) | November 11th, 2017 (Full day) |
| May 1st, 2017 (Full Day) | November 18th, 2017 (Full day) |

I agree to work on make-up date(s) mention above. I understand that I will not be able to change the make-up date's mention above after the approval is granted.

Ashu Garg, MD
Resident

5/16/2017
Date

Determine if available make-up date(s) are feasible with the schedule and does not violate duty hour policy.

Salonee Parikh
Residency Program Coordinator

5/17/17
Date

Neha Agrawal
Chief Resident

B. Siegvan

5/17/17

5/17/17
Date

**Return completed form to the Program Coordinator. Approval is not granted until the completed form is returned with required approvals to the Program Coordinator.**

Salonee Parikh
Residency Program Coordinator

5/17/17
Date

# EXHIBIT M

## Match Home Page

Applicant Name: ashu garg

Username: drashugarg

NRMP ID: N0485828

Applicant Type: U.S. Citizen Student/Graduate of International Medical School

Applicant Status: CERTIFIED

**Match Results:** *Congratulations, you have matched!*

**Program Code:** *2978427F0*

**Program Description:** *NYU School Of Medicine - Interventional Radiology.*

View Unfilled Programs

My Rank Order List

My Reports

Program Directory

# EXHIBIT N



SAINT VINCENT HOSPITAL

June 21, 2017

Re: Stage Two Warning follow-up, Portfolio Review meeting

Dear Dr. Garg,

As per the St. Vincent Hospital Graduate Medical Education Policy and Procedure Manual, this letter is documented specific follow-up to your consecutive Stage One (2/23/17) and Stage Two (5/3/17) Written Warnings (attached). It is also part of your year-end Educational Portfolio Review meeting.

As previously detailed in your Stage Two Warning letter:

- "Assessment will be continuous and the next formal reevaluation of your warning status will be at the completion of your next week of night float (June 10-15, 2017). In the interim you will also have your end-of-year portfolio and milestone reviews and all performance data will be considered."
- "Consequences of noncompliance may include, but are not limited to those in the Saint Vincent Hospital GME Manual; additional work assignments, limitation of responsibilities, temporary suspension, non-reappointment, or dismissal from the residency program."

You have failed to meet basic competence performance levels for your PGY level over 2 continuous warning stages. We cannot indefinitely extend warning periods nor continually modify your schedule and responsibilities. We have been patient and supportive in providing you time and resources to achieve your goals, understanding the transition you needed to make following transfer into our program on Sept. 12, 2016. Although (as we have discussed and documented) you have demonstrated some progress and improvement from your low baseline performance at entry, you remain well below satisfactory performance levels for an R3 resident (scheduled to be R4 on July 1). There is no option to extend your training at Saint Vincent Hospital as was done in your prior program.

Evaluation is based on the following assessment data:

Faculty Evaluations:

Evaluations of your recently completed Night Float assignment (the specified final component of your Stage Two evaluation period) underscore your failure to progress and meet satisfactory levels of performance overall and in key core competencies:

Scale 1-5: 1=Unsatisfactory, 2=Marginal, 3=Satisfactory, 4=Very Good, 5=Excellent.

- Overall Performance                              1.8
- Medical Knowledge                               2.0
- Clinical Judgment                                 2.6
- Clinical Skills                                        2.5
- Interpersonal and Communication Skills    1.8

Scanned by CamScanner

Your end-of-year Resident General Evaluations underscore your continued failure to meet satisfactory levels of performance overall and in key core competencies:

- Overall Performance                          2.22
- Interpersonal and Communication Skills        2.44
- Medical Knowledge                             2.26
- Practice Based Learning and Improvement  2.22


- Of note, your highest marks were satisfactory in the core competencies of Professionalism (3.00) and Attendance and Availability (3.26). These are your strengths and a testament to your effort for which I have commended you repeatedly throughout your time with us.

In addition to the recent Night Float and General end of year evaluations described above, you were also evaluated as below satisfactory performance in key areas for additional recent rotations including Night Float April and May 2017, Fluoro May 2017, Inpatient CT April 2017 and Inpatient CT May 2017.


Faculty comments (attached):

Faculty comments throughout all of your evaluations, and specifically the key Night Float and General Evaluations during this last assessment period, further elucidate your failure to progress, and lack of performance for your expected PGY level. All evaluations and comments have been available to you on the My Evaluation system, and are also reviewed with you directly as part of today's meeting.


Report Quality:

All independently read call cases are reviewed for quality and accuracy for all residents. For your recent Night Float rotation (Sat June 10, 8 pm-Fri June 16, 8am) a tabulation shows a disproportionately large number of report revisions for your PGY level. This issue has shown no improvement from your last warning which stated "While the number of significant misses has decreased significantly, the quality and clarity of a large number of reports remains unsatisfactory. This requires significant revision time by the Faculty to assure that the findings and impression are clear to the providers."

- Cases requiring revision       184
- Total cases read               399
- Re-read rate                   46%

This high number of rereads is a significant outlier for any PGY level. While there were no critical misses, the impact on throughput including required provider and patient notification for report changes, was overwhelming for the faculty and support staff. The need for almost 1/2 of

Scanned by CamScanner

all your reports to require revision highlights your inability to meet satisfactory performance levels for a radiology resident at the end of their R3 year. Your current performance level for indirectly supervised reads is assessed to be unsatisfactory (would be marginal even for an R1 resident at this stage of the year). The interim educational interventions with schedule modifications, additional CT rotations, additional evening and weekend direct supervision case reviews, and overall increased volume and reading expectations for all modalities have shown no significant impact on performance improvement.

360 evaluations

At the end of the academic year 360 evaluations are utilized to receive feedback for all residents from the technologists/nurses/support staff that work with residents on a daily basis. These anonymous evaluations are utilized to assess a resident's performance in 2 categories: Interpersonal and Communication Skills and Professionalism. You received concerning negative assessments by the staff which provides insight into your daily routine which may not be otherwise evidenced by faculty. The comments are listed here. In addition I previously met with you to review specific concerns reported to me by technologists regarding a fluoro incident you were involved in on Tuesday, May 30 which necessitated your immediate removal from the rotation pending further evaluation and intervention.

Fluoro:

- "Does not know what he is doing, will not listen."
- "Seems to be put off with younger residents."
- "It is very embarrassing for us. The patients do not feel comfortable."
- "Disregards staff, demeaning."
- "Has a problem following new protocols in fluoro."
- "Needs to improve with communication with patients, techs, and fellow residents."
- "Needs to accept help."
- "Needs to take accountability for faults."

Ultrasound:

- "Needs to improve his communication skills with patients. Especially when delivering results and being informative during procedures."
- "Dr. Garg does not answer pages on a consistent basis."

Mammo:

- "Lacking in communication skills with both patients and healthcare team."

In summary, you have not demonstrated significant progress over 2 continuous warning periods. Your performance level remains unsatisfactory and of particular concern for patient care when you are functioning with indirect supervision. This necessitates further schedule modification precluding you from fully participating in program requirements for your PGY level. Given the failure to progress and

Page 3 of 4

meet minimum performance expectations, as well as the limited remaining training time available, the decision has been made to proceed with your dismissal from the residency program.

As per the Saint Vincent Hospital Graduate Medical Education Policy and procedure Manual, you have the right to initiate a formal appeal to this decision. There is a five step appeal process available to you; as a first step you may request in writing that I modify or withdraw the action which must be submitted with five (5) work days after receipt of this letter. Should you choose to proceed with the appeal you are entitled to remain in the residency program for the duration of the process. For patient care your schedule will again be modified with limitation of responsibilities to include removal from the schedule for any indirectly supervised call and removal from any supervisory/teaching role with junior residents or medical students.

We appreciate the efforts you have made and wish you the best.

Sincerely,

David A. Bader, MD., FACR
Chief of Radiology
Residency Program Director

Date: _6/4/17_

Paulomi Kanzaria, MD
Associate Program Director

Date: _6/21/17_

Documentation of receipt. My signature below documents receipt of this letter and that I was present for the evaluation review with Dr. Bader and Dr. Kanzaria. I reserve the right to initiate an appeal.

Date: _____

Ashu Garg, MD.

Cc: Dr. Brian Midkiff, Associate Residency Director

*Dr. Garg refused to accept/sign this letter at the time of the meeting with me and Dr. Kanzaria. He requested that it be mailed to his home address.*

MGM 11/4/17 Page 4 of 4
1430

Scanned by CamScanner

# EXHIBIT O

## Resident Milestone Evaluation: Year-End 2016-2017

Program: **St Vincent Hospital Program  4202412089 - Radiology-diagnostic**

Resident: **Ashu Garg**                    Date Evaluation Completed: **May 24, 2017  (Year-End)**        Resident Year in Program: **3**

This form documents the most recent resident attainment of the milestones within each of the competencies as formally observed. Evaluation of the resident's developmental progression is based on numerous formative evaluations and the overall judgment of the resident's performance by the Clinical Competency Committee.

| Competency | SubCompetency |
|---|---|
| **Developmental Milestone Narrative** | |

**1  Patient Care**  Consultant (PCTS1)

**Dr. Garg is between Level 1 and Level 2.**

Uses established evidence-based imaging guidelines such as American College of Radiology (ACR) Appropriateness Criteria®.

Appropriately uses the Electronic Health Record to obtain relevant clinical information.

In addition, Dr. Garg has achieved certain, but not all, elements of the competency level listed below:

Recommends appropriate imaging of common* conditions independently.

*As defined by the residency program.

**2  Patient Care**  Competence in procedures (PCTS2)

**Dr. Garg is at Level 1.**

Competently performs basic procedures* under indirect supervision.

Recognizes and manages complications of basic procedures.

*Basic procedures, as defined by each residency program, include those needed to take independent call.

**3  Medical Knowledge**  Protocol selection and optimization of images (MK1)

**Dr. Garg is at Level 1.**

Selects appropriate protocol and contrast agent/dose for basic imaging, including protocols encountered during independent call as defined by the residency program.

Recognizes suboptimal imaging.

**4  Medical Knowledge**  Interpretation of examinations (MK2)

**Dr. Garg is between Level 1 and Level 2.**

Makes core observations, formulates differential diagnoses, and recognizes critical findings.

Differentiates normal from abnormal.

In addition, Dr. Garg has achieved certain, but not all, elements of the competency level listed below:

Makes secondary observations, narrows the differential diagnosis, and describes management options.

**5  Systems-Based Practice**  Quality Improvement (SBP1)

Has Not Achieved Level 1.

**6  Systems-Based Practice**  Health care economics (SBP2)

**Dr. Garg is at Level 1.**

Describes the mechanisms for reimbursement, including types of payors.

© 2017 Accreditation Council for Graduate Medical Education (ACGME)

## *Resident Milestone Evaluation: Year-End 2016-2017*

Program: **St Vincent Hospital Program  4202412089 - Radiology-diagnostic**

Resident: **Ashu Garg**          Date Evaluation Completed: **May 24, 2017  (Year-End)**     Resident Year in Program: **3**

| Competency | SubCompetency |
|---|---|
| **Developmental Milestone Narrative** | |

---

**7  Practice-Based Learning and Improvement**          **Patient safety: contrast agents; radiation safety; MR safety; sedation (PBLI1)**

**Dr. Garg is at Level 1.**

**Contrast Agents:**
Recognizes and manages contrast reactions.

**Radiation Safety:**
Describes the mechanisms of radiation injury and the ALARA ("as low as reasonably achievable") concept.

**MR Safety:**
Describes risks of MRI.

---

**8  Practice-Based Learning and Improvement**          **Self-Directed Learning (PBLI2)**

**Dr. Garg is at Level 1.**

Develops an annual learning plan based on self-reflection and program feedback.

---

**9  Practice-Based Learning and Improvement**          **Scholarly activity (PBLI3)**

Has Not Achieved Level 1.

---

**10  Professionalism**          **Professional Values and Ethics (PROF1)**

**Dr. Garg is at Level 1.**

Demonstrates the following professional behaviors:

- Recognizes the importance and priority of patient care and advocates for patient interests.

- Fulfills work-related responsibilities.

- Is truthful.

- Recognizes personal limitations and seeks help when appropriate.

- Recognizes personal impairment and seeks help when needed.

- Responds appropriately to constructive criticism.

- Places needs of patients before self.

- Maintains appropriate boundaries with patients, colleagues, and others.

- Exhibits tolerance and acceptance of diverse individuals and groups.

- Maintains patient confidentiality.

- Fulfills institutional and program requirements related to professionalism and ethics.

- Attends required conferences.

---

**11  Interpersonal and Communication Skills**          **Effective communication with patients, families, and caregivers (ICS1)**

**Dr. Garg is at Level 1.**

Communicates information about imaging and examination results in routine, uncomplicated circumstances.

Obtains informed consent.

---

© 2017 Accreditation Council for Graduate Medical Education (ACGME)

## Resident Milestone Evaluation: Year-End 2016-2017

Program: **St Vincent Hospital Program  4202412089 - Radiology-diagnostic**

Resident: **Ashu Garg**  Date Evaluation Completed: **May 24, 2017  (Year-End)**  Resident Year in Program: **3**

| Competency | SubCompetency |
|---|---|
| **Developmental Milestone Narrative** | |
| **12 Interpersonal and Communication Skills** | **Effective communication with members of the health care team (ICS2)** |

**Dr. Garg is at Level 1.**

Adheres to transfer-of-care policies.

**Written/Electronic:**
Generates accurate reports with appropriate elements required for coding.

**Verbal:**
Communicates urgent and unexpected findings according to institutional policy and ACR guidelines.

© 2017 Accreditation Council for Graduate Medical Education (ACGME)

Case 5:21-cv-00605-DRH Document 2-1 Filed 10/08/21 Page 75 of 86
Case 4:20-cv-40060-DHH Document 1-15 Filed 09/28/20 Page 9 of 5

Page: 4 of 4

## *Resident Milestone Evaluation: Year-End 2016-2017*

Program: **St Vincent Hospital Program  4202412089 - Radiology-diagnostic**

Resident: **Ashu Garg**          Date Evaluation Completed: **May 24, 2017  (Year-End)**     Resident Year in Program: **3**

**COMMENTS:**

Reviewed with Dr. Garg at Portfolio review
meeting on 6/21/17 (with Dr. Kaufman).

Narrative form became available from ACGME
on 7/7/17.

_____
**Program Director Signature**          _____
                                        **Resident Signature**

***Disclaimer:*** **For Program Use Only.**

The Milestones are designed only for use in evaluation of resident physicians in the context of their participation in ACGME accredited residency or fellowship programs. The Milestones provide a framework for the assesment of the development of the resident physician in key dimensions of the elements of physician competency in a specialty or subspecialty. They neither represent the entirety of the dimensions of the six domains of physician competency, nor are they designed to be relevant in any other context.

© 2017 Accreditation Council for Graduate Medical Education (ACGME)

# EXHIBIT P

## **Resident General Evaluation

Evaluation of Resident

Resident: Ashu Garg
Evaluation period: 07/01/2016 to 06/30/2017

Evaluator: John Mukai
Rotation name: General

### Professionalism

**Demonstrates integrity and ethical behavior; Accepts responsibility and follows through on tasks.**

*Takes responsibility for actions willingly; admits mistakes; puts patient needs above own interests; recognizes & addresses ethical dilemmas & conflicts of interest; maintains patient confidentiality; is industrious & dependable; completes tasks carefully & thoroughly; responds to requests in a helpful & prompt manner.*

Very Good (4.00)

### Attendance & Availability

Does this Resident begin work on time?

Very Good (4.00)

How is this Resident at making themselves generally available?

Very Good (4.00)

Does this Resident stay late when appropriate?

Very Good (4.00)

## Interpersonal and Communication Skills

Show sensitivity to and communicate effectively with all members of the health care team

Satisfactory (3.00)

Produce radiologic reports that are accurate, concise, and grammatically correct

Satisfactory (3.00)

## Medical Knowledge

Knowledge level appropriate for PGY level

Satisfactory (3.00)

Ability to interpret unknown films in conference.

Satisfactory (3.00)

| Rotation productivity. |
|---|
| Satisfactory (3.00) |

## Practice-Based Learning and Improvement

| Recognize and correct personal errors |
|---|
| Satisfactory (3.00) |

## Overall/Summary

| Resident's overall performance for this evaluation period.[[sliding scale]] |
|---|
| Satisfactory (3.00) |

Evaluator Comments
Very receptive to feedback. Not sure, sometimes issues discussed remain issues. But there is progres
*I did verbally discuss this evaluation with the resident face-to-face. Signed - Dr.John Mukai*

Program Director Comments
Comments Not Available

Case 5:21-mc-00005-P   Document 2-1-1   Filed 10/18/21   Page 80 of 86

# EXHIBIT Q





Radiology

Alex G.
Morales-Perez, M.D.
PG Level 6

Ghasan
Ahmad, M.D.
PG Level 3

Neha
Agrawal, M.D.
PG Level 5

Mohammed
Ahmed, M.D.
PG Level 4

Rakesh
Amin, M.D.
PG Level 3

Ari
Damla, M.D.,
PG Level 2

Joanie
Garratt, M.D.
PG Level 5

Ashu
Garg, M.D.
PG Level 5

Jerzy
Januszklewicz, M.D.
PG Level 2

Ganesh
Joshi, M.D.
PG Level 5

Vaishali D.
Kapare, M.D.
PG Level 2

Neha
Modi, M.D.
PG Level 3

Nishad
Nadkami, M.D.
PG Level 4

Nooshin
Najmi, M.D..
PG Level 2

Soniya
Pinto, M.D.
PG Level 3

Mani
Razmjoo, M.D.
PG Level 4

Jubouri
Shams, M.D.
PG Level 4

Case 5:21-mc-00005-P   Document 2-1   Filed 10/18/21   Page 83 of 86

# EXHIBIT R

Case 5:21-cv-00005-RH   Document 2-1   Filed 10/09/21   Page 84 of 86

**From:** Barbara Buell <barbara.buell@smithduggan.com>
**Date:** August 1, 2017 at 4:19:59 PM EDT
**To:** Benjamin Flam <bflam@gordonllp.com>
**Cc:** Alexander Babcock <alexander.babcock@smithduggan.com>
**Subject: Garg**

Dear Ben:

I have confirmed with my client, Jeffrey Welch, CEO, that you are not invited to the Stage 4 Appeal meeting on Thursday at 8 AM. Attorneys are not permitted in these meetings which are internal Graduate Medical Education appeal meetings per the Graduate Medical Education Policies and Procedures Manual.

Barbara

**BARBARA HAYES BUELL, PARTNER**



SMITH DUGGAN BUELL & RUFO LLP

Smith Duggan Buell& Rufo LLP | 55 Old Bedford Road | Suite 300 | Lincoln, MA 01773

T 617.228.4460 | Fax: 781-259-1112 | www.smithduggan.com

*The information contained in this transmission and any files attached to it are privileged, confidential and intended for the use of the individual or entity named above.  It may contain material protected by attorney-client privilege.  If you have received this in error, please do not read, copy, or retransmit this communication but delete it from your hard drive and contact the sender to report the error. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited. Thank you.*

# EXHIBIT S





# AMERICAN BOARD OF RADIOLOGY

5441 E. Williams Circle · Tucson, Arizona 85711-7412
Phone (520) 790-2900 · Fax (520) 790-3200 · www.theabr.org

**BOARD OF GOVERNORS**

**Lisa A. Kachnic, MD**
President
Nashville, Tennessee

**Brent J. Wagner, MD**
President-Elect
Reading, Pennsylvania

**Geoffrey S. Ibbott, PhD**
Secretary/Treasurer
Houston, Texas

Donald P. Frush, MD
Durham, North Carolina

Mary C. Mahoney, MD
Cincinnati, Ohio

Vincent P. Mathews, MD
Milwaukee, Wisconsin

Matthew A. Mauro, MD
Chapel Hill, North Carolina

Duane G. Mezwa, MD
Royal Oak, Michigan

**BOARD OF TRUSTEES**

**Donald P. Frush, MD**
Chair
Durham, North Carolina

**Diagnostic Radiology**

Sanjeev Bhalla, MD
St. Louis, Missouri

Cheri L. Canon, MD
Birmingham, Alabama

Lane F. Donnelly, MD
Houston, Texas

Donald J. Flemming, MD
Hershey, Pennsylvania

Mary S. Newell, MD
Atlanta, Georgia

M. Elizabeth Oates, MD
Lexington, Kentucky

Robert D. Zimmerman, MD
New York, New York

**Radiation Oncology**

Kaled M. Alektiar, MD
New York, New York

Stephen M. Hahn, MD
Houston, Texas

Dennis C. Shrieve, MD, PhD
Salt Lake City, Utah

Lynn D. Wilson, MD, MPH
New Haven, Connecticut

**Interventional Radiology**

John A. Kaufman, MD
Portland, Oregon

Jeanne M. LaBerge, MD
San Francisco, California

James B. Spies, MD, MPH
Potomac, Maryland

**Medical Physics**

Jerry D. Allison, PhD
Augusta, Georgia

Matthew B. Podgorsak, PhD
Buffalo, New York

J. Anthony Seibert, PhD
Sacramento, California

October 11, 2017

Ashu Garg, MBBS
drashugarg@gmail.com

ABR ID: 70358

**Re: Core Exam Eligibility**

Dear Dr. Garg,

The letter concerns your eligibility to sit for the ABR's Core Exam and your registration for the November 2017 Core Exam.

It has come to our attention through notification by Saint Vincent Hospital that you are no longer with their residency program as of August 9, 2017, which is one month short of the completion of 36 months of training.

Per the prerequisites for the ABR's Core Exam, located at https://www.theabr.org/diagnostic-radiology/initial-certification/core-exam/prerequisites-registration, you must have successfully completed 36 months of diagnostic radiology residency training.

With this notification, your registration for the November 2017 Core Exam has been cancelled, and your application with the ABR will be inactivated to cease any accrual of annual fees while you are not in residency.

When you resume Diagnostic Radiology residency training, please have your new program submit a letter of acceptance to the ABR to have your application for certification reactivated.

Sincerely,

Valerie P. Jackson, M.D.
Executive Director

**Valerie P. Jackson, MD, Executive Director**

**Associate Executive Directors**

Interventional Radiology
Anne C. Roberts, MD

Medical Physics
G. Donald Frey, MD

Radiation Oncology
Paul E. Wallner, DO